[Civ. No. 13719. First Dist., Div. One. Feb. 4, 1948.]

JADWIGA CURTIN, Petitioner, v. SUPERIOR COURT OF SAN MATEO COUNTY et al., Respondents.

Wayne R. Millington for Petitioner.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondents.

BRAY, J.—Petitioner was charged jointly with one Howard Durham with the crime of robbery (violation of Pen. Code, § 211). At the preliminary examination both defendants were held to answer. The sole question presented here is whether the evidence showed probable cause of the guilt of the petitioner.

The sole witness was one George Caulfield. He testified that on Sunday night, October 12, 1947, he was in a certain bar in San Mateo County, and occupied a bar seat next to petitioner. She started a conversation with him by asking where he lived. After some conversation on other matters she mentioned that she had lived on a farm and was interested in horses. She suggested that he drive her to a place to which she had that day seen a car drive, with horses in back of it. She stated that she wanted to talk to the rancher and look over the place in general. While in the bar, he noticed the defendant Durham sitting about 10 feet to his left where the bar made a right angle turn, so that Durham was facing him. Durham was staring at him, or at the person alongside of him. Petitioner mentioned the fact that she knew one individual in the barroom, but did not indicate who he was, nor did she indicate Durham. Caulfield and petitioner entered the former's car, and he drove up the highway and then up a dirt road for about 50 yards. It was very dark. Petitioner suggested that they walk from there over to a hill. Both got out of the car. Petitioner suggested leaving her purse and coat in the car, which she did. They walked about 200 yards from the car to the top of a knoll and stood there five to seven minutes looking at the lights in the distance. The road upon which they stopped the car continued on, and two or three blocks up there was a ranch house. There were no lights in it, but lights from the distant airport reflected in its windows. They saw no horses. They turned back towards the car, and when about 50 yards from it, Caulfield saw someone approaching in the dark. It was too dark for him to identify who was approaching. The man flashed a light in Caulfield's eyes, and he then saw a gun next to the flashlight. The man said, "Stand where you are." Both petitioner and Caulfield raised their hands. The man ordered petitioner to take Caulfield's wallet. Caulfield said that it was in his left rear pocket. Petitioner took the wallet out of his pocket. He asked the man to leave the wallet and take the money, and the man ordered petitioner

to take the money out of the wallet. This she did, throwing the money on the ground and returning the wallet to Caulfield. (Later he found that there was still $20 remaining in the wallet.) Apparently the amount taken was $30. The man told him to lower his hands a bit and told petitioner to take the watch off his left hand. The sleeve of his jacket covered the watch, and petitioner stated, "He has no watch." Then petitioner found the watch, and either threw it on the ground or gave it to the man. He could not say whether or not the man ordered petitioner to make a further search for the watch before she found it. The man then asked petitioner where her purse was. When she told him, the man ordered her to go back to the car and get it. She walked back to the car, the man and Caulfield remaining where they were. After the first few steps, because of the darkness Caulfield could not see petitioner until he saw her leave the car with her purse and coat in her hand. This he saw because the car was silhouetted against the distant lights. On leaving the car she ran for about two or three steps and disappeared in the darkness. The man then ordered him to walk back to the car, the man following him. The man ordered him to get into the car and wait five minutes, and then started walking towards the highway. After waiting a minute and a half or so, he turned the car around, drove to the highway and then to the San Bruno police station. Three or four mornings later he identified defendant Durham as the man he saw in the bar, and, by his voice, as the man who held him up.

Section 872 of the Penal Code provides: "If, however, it appears from the examination that a public offense has been committed, and there is *sufficient cause* to believe the defendant guilty thereof" the magistrate must hold the defendant to answer. (Emphasis added.)

" 'Probable cause' is a state of facts which inclines a man of ordinary prudence conscientiously to entertain a strong suspicion that a prisoner is guilty. (*People* v. *Novell*, 54 Cal.App.2d 621 [129 P.2d 453]; *In re McCarty*, 140 Cal.App. 473 [35 P.2d 568].)" (*People* v. *Wisecarver*, 67 Cal.App.2d 203 [153 P.2d 778].)

"It is said in *Greenberg* v. *Superior Court*, 19 Cal.2d 319, 322 [121 P.2d 713]:

" 'It has long been settled in most jurisdictions that an indictment is invalid if it is unsupported by any evidence

before the grand jury. (See cases collected in 59 A.L.R. 567.) If there is some evidence to support the indictment the courts will not inquire into its sufficiency (see cases collected in 59 A.L.R. 573) . . .'

"It has long been settled that in the analogous case of an information the evidence before the committing magistrate is not subject to the same test as that before a trial jury in a criminal case and probable cause may be found for the holding to answer although the evidence does not establish the defendant's guilt beyond a reasonable doubt. All that is required is a reasonable probability of the defendant's guilt. (*People* v. *Mitchell,* 27 Cal.2d 678, 681 [166 P.2d 10] ; *People* v. *Wisecarver,* 67 Cal.App.2d 203, 209 [153 P.2d 778]; 7 Cal.Jur. 982.)

"The Supreme Court in *Greenberg* v. *Superior Court, supra,* did not explain whether it thought that the same rule should apply in the case of an indictment as in the case of an information. It at least indicated that no severer rule should be applied when it used the language above quoted.

"We are satisfied that the evidence against petitioner Stock if given before a committing magistrate would support an information. We must hold (quoting the language of the Greenberg case) that 'there is some evidence to support the indictment.' " (*Davis* v. *Superior Court,* 78 Cal.App.2d 25 [177 P.2d 314].)

7 California Jurisprudence, page 982, section 120, states: "The term 'sufficient cause' used in section 872 of the Penal Code, means about the same as the term 'reasonable and probable cause' in the habeas corpus act. The term 'probable' has been defined to mean 'having more evidence for than against; supported by evidence which inclines the mind to believe, yet leaves room for doubt.' And the term 'reasonable or probable cause' has been defined to mean such a state of facts as would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion that the person accused is guilty."

Does the evidence in this case meet the test of inclining "a man of ordinary prudence conscientiously to entertain a strong suspicion" (*People* v. *Wisecarver, supra,* p. 209) that petitioner is guilty? I think it does.

The suggestion of going to the place where the holdup took place came from petitioner. Ostensibly she was going there to talk to the rancher about horses, and to look over

the place; and it is a reasonable inference from the evidence that she directed the victim as to the location of the ranch to which she wanted to go. Instead of driving up the road to the ranch house, when the car stopped petitioner suggested that they walk from where they were. When they reached the top of the knoll she no longer evinced any interest in horses, the rancher or the ranch. It is true that the ranch house appeared dark from the distance, but, if her interest, as expressed, was not a mere ruse to get the victim to that particular place, she would have at least suggested that they approach a bit nearer than two or three blocks to see if there might not be a light in the rear of the house. It was then only shortly after 9 o'clock in the evening. When they left the car, they were presumably (in view of her statements at the bar) going to walk to the ranch house where she could talk to the rancher and look the place over; yet she left her purse in the car. In a few moments the holdup man appeared. After obtaining petitioner's assistance in robbing Caulfield, the robber permitted her to leave their immediate presence and go to the car to get her purse. The car was 50 yards away. It was so dark that she could not be seen during the time she traversed that distance. A holdup man who was particularly concerned about her and her purse would have accompanied her back to the car and taken Caulfield with him. As a matter of fact, as soon as petitioner made her getaway the man did return to the car with the victim. When petitioner disappeared, the robber said nothing, and apparently showed no concern whatever over that fact. Any one of these circumstances, taken alone, might not be sufficient to justify a belief that petitioner was acting as the robber's confederate, but, taken together, they raise a very strong suspicion in that respect. Taking all of petitioner's actions with the fact that the holdup was accomplished by the man who sat opposite her and the victim in the bar, and at a place selected by her for reasons which she entirely disregarded on arrival there—they are not the actions of a woman innocent of knowledge that a holdup is to be accomplished. While it is possible that in spite of the whole situation she might be innocent, nevertheless the circumstances justify a reasonable person in drawing a strong suspicion of her guilt. Nor is a reasonable person's suspicion of petitioner's actions lessened by the fact that in examining the victim's wallet, she overlooked a $20 bill

(whether purposely or accidentally does not appear), nor by the fact that, at first, she reported that the victim did not have a watch. As pointed out by Caulfield, the elastic band of his jacket sleeve concealed it, and, in his opinion, made it hard to find.

Petitioner relies upon the decision in *Greenberg* v. *Superior Court*, 19 Cal.2d 319 [121 P.2d 713]. However, in that case there was no evidence concerning the defendant Greenberg introduced at the grand jury hearing. "The transcript of the testimony upon which the indictment was based contains no evidence *even remotely* supporting the charges made against petitioner." (P. 321; emphasis added.) But the rule of law established by that case applies here. "If there is *some evidence* to support the indictment, the courts will not inquire into its sufficiency. . . ." (P. 322; emphasis added.) Likewise in the case of *Dong Haw* v. *Superior Court*, 81 Cal.App.2d 153 [183 P.2d 724], where the court held that the "transcript fails to disclose any legal evidence to support the indictment" (p. 155) the court endorsed the rule of the Greenberg case and said, ". . . the courts will not inquire into its sufficiency *if there is some evidence to support the indictment* . . ." (p. 158; emphasis added.) While the evidence in our case would not be strong enough to support a verdict of guilty (such evidence is not required at a preliminary examination (*Davis* v. *Superior Court, supra* [78 Cal.App.2d 25]; *People* v. *McRae*, 31 Cal.2d 184 [187 P.2d 741])) it is strong enough to constitute "some evidence" to support the charge, and hence its sufficiency will not be inquired into.

It cannot be said as matter of law that it would be unreasonable for a man of ordinary caution to believe that the combination of suspicious circumstances here would not occur unless the petitioner were in on the crime. At least, such a combination is so unlikely to occur, if petitioner were innocent, that even if it might be consistent with innocence, it nevertheless would cause a reasonable person to entertain a strong suspicion that this was not the exceptional situation of innocence, but the more usual and likely one of guilt.

The alternative writ is discharged and the petition for a writ of prohibition is denied.

Ward, J., concurred.

PETERS, P J.—I dissent.
The record of the preliminary examination, so far as this

petitioner is concerned, demonstrates that there was no evidence, as distinguished from mere guess, surmise or conjecture, to connect this petitioner with the offense with which she is charged.

I have no quarrel with the law stated in the majority opinion—it is with the application of that law to the facts that I disagree. We start with the basic premise that in order to hold an accused to answer under section 872 of the Penal Code there must be "sufficient cause to believe the defendant guilty." Admittedly that means "reasonable and probable cause" (see many cases collected 7 Cal.Jur. § 120, p. 982) and concededly that phrase means evidence of such character as to lead a man "of ordinary prudence conscientiously to entertain a strong suspicion that a prisoner is guilty." (*People* v. *Wisecarver,* 67 Cal.App.2d 203, 209 [153 P.2d 778] ; see, also, *People* v. *Novell,* 54 Cal.App.2d 621 [129 P.2d 453] ; *In re McCarty,* 140 Cal.App. 473 [35 P.2d 568] ; cases collected 7 Cal.Jur. § 120, p. 982.) Such cases as *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713], and *Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153 [183 P.2d 724], have established beyond question that where there is no evidence, or no reasonable probability of petitioner's guilt based upon evidence, the superior court has no jurisdiction to try the accused, and that the trial, in such event, should be stopped by a writ of prohibition. It certainly needs no citation of authority to establish the principle that a mere surmise, guess or conjecture does not constitute "evidence" in a legal sense. As was aptly stated in the Dong Haw case where the suspicious circumstances were much stronger than those here, but where, nevertheless, a writ of prohibition issued (p. 158): "Conspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy." (See, also, *People* v. *Long,* 7 Cal. App. 27 [93 P. 387] ; *People* v. *Zoffel,* 35 Cal.App.2d 215 [95 P.2d 160].)

The reasons behind the rule that entitle one accused either by indictment or information to a writ of prohibition where no "evidence" is produced before the grand jury or committing magistrate are obvious and are based on sound public policy. No person should be forced to trial unless the district attorney produces before the grand jury or committing magistrate some evidence sufficient to raise at least a reasonable suspicion that the accused is guilty. That does

not mean as some district attorneys and the attorney general have, on occasion, contended, that the district attorney must disclose his entire case before the grand jury or .committing magistrate, which obviously would be unfair to the prosecution, but it does mean that he must produce some evidence that tends to connect the accused with the crime charged. Otherwise the criminal processes can and will be abused.

Now how do these admitted rules of law apply to this case? Caulfield met the petitioner at a bar. She opened the conversation and requested that he drive her to a designated spot to look over a horse ranch. There is not one word in the record (and we are limited to the record) that petitioner knew Durham, or that Durham saw, or that petitioner saw, that Caulfield had $50 in his wallet. So far there is nothing remotely resembling any evidence that this "pick-up" in the bar was any different from any other "pick-up," or was for the purpose of robbery. The two then drove to the side road designated by petitioner and proceeded along this road for about 50 yards. The majority opinion states that "Instead of driving up the road to the ranch house when the car stopped petitioner suggested that they walk from where they were," and from this statement the opinion implies that petitioner picked the spot for the subsequent holdup. This inference is not warranted by the record. It was Caulfield who stopped the car. The only testimony on this point was by Caulfield, and is as follows: "we drove, perhaps, 50 yards from the highway. At that time, I parked the car." (P. 6.) And again at page 17 he was asked "And you stopped at this point?" To which he answered "Yes." There is no evidence upon which a reasonable suspicion can be predicated, or in fact even a guess made, that it was petitioner who suggested that they stop at that spot. The evidence is to the contrary.

It is also stated in the majority opinion that after petitioner suggested they walk up the hill "they were presumably, in view of her statements at the bar, going to walk to the ranch house where she could talk to the rancher," and then the opinion infers that this is a most suspicious circumstance in that an innocent person would not have left her purse in the automobile if she had intended to walk to the ranch house. There is no evidence at all upon which the inference that they intended to walk to the ranch house can be based.

The only evidence on this point as to why they walked up the hill was the following, appearing on page 17: "Q. And you and she left the car? A. Yes. Q. For what purpose? A. To look over the place, just to walk around. Q. What were you going to look at? A. We just looked at the place to find out where the ranch house was, what the place looked like." Whatever purpose the parties may have had in walking up the hill on a dark night (and there might be several reasonable guesses on that question) certainly the inference indulged in by the majority that they were going to walk to the ranch house finds no support in the record, and is contrary thereto. In this respect, as well as in the respect already discussed, the majority have simply filled in the gaps in the district attorney's proof and indulged in what cannot be characterized as even reasonable guesses, because the guesses are not only not based upon the record but are contrary thereto.

It thus appears that except for the fact that petitioner suggested the road to take, but not the stopping place, there is not one suspicious circumstance up until the time the robber appears. And then what happens? Under the robber's orders petitioner removes the wallet from Caulfield's pocket. The theory of the district attorney was, of course, that she was a confederate of the robber—that she was a participant in the robbery. But what does this supposed robber do? She removes $30 in bills from the wallet and leaves in the wallet a $20 bill, and returns the wallet to Caulfield! Then the robber orders her to remove Caulfield's watch. The theory was that the robber must have observed this watch while petitioner and Caulfield were in the bar drinking. But petitioner tells the robber that there is no watch. The majority opinion seeks to explain this by Caulfield's testimony that he was wearing a jacket that partially covered the watch, but, if this explanation is sound, Durham, sitting across the room from Caulfield saw the watch, but the petitioner, who it is assumed was plotting to rob Caulfield, after sitting next to him for over half an hour in the bar, did not see the watch! It is obvious that up to this point there is no evidence, or even a suspicious circumstance, to connect petitioner with the robbery.

Then what happens? The robber asks petitioner for her purse. She says that it is in the car. He orders her to get it. She goes to the car, gets her purse and coat, and runs

away—in what direction does not appear. It should be here noted that there is not one word of testimony that she did not immediately report the affair to the police. For all that appears, she may have immediately informed the police. There is no support for any inference that she did not.

The majority opinion talks about the unconcern of the robber at this point, and makes much of the fact that the robber must have been very dumb indeed to permit petitioner to go back to the car alone to get her purse. While that may warrant a guess that the two were confederates, it equally warrants the surmise that the robber was dumb, and that petitioner took advantage of his dumbness to escape and to save her purse.

The majority opinion places great reliance on what is characterized as the "combination of suspicious circumstances." Upon analysis each "suspicious circumstance" turns out to be an inference not justified by the record—a mere guess on the part of the majority, and a guess not based upon the record. If one guess does not constitute evidence sufficient to constitute reasonable and probable cause, two or more guesses cannot be held to constitute such cause.

Those are the facts. There is not one bit of evidence that petitioner ever knew Durham, who was identified as the robber by Caulfield, and I submit that there is not one bit of evidence to support a "strong" or "reasonable" suspicion that petitioner was a participant in the robbery. The inferences indulged in by the majority, as already pointed out, are simply guesses unsupported by the evidence.

I am not so naive as to believe that petitioner may not have been a confederate of the robber. She may have been, and, from what has transpired since the preliminary examination, she probably was. But we have no legal right to consider what has happened since the date of the preliminary examination. The point is that, at that examination, the district attorney just failed to connect her with this crime. We cannot and should not consider facts not appearing in the record. We are limited to the record. In the proper administration of criminal justice it is required that the district attorney produce at the preliminary examination some evidence to connect the accused with the crime charged. If he fails to do so, as he did in this case, the accused is entitled to a writ of prohibition from this court. In my opinion such a writ should here issue.