[Crim. No. 2052. First Appellate District, Division One.—October 20, 1939.]

THE PEOPLE, Respondent, v. FRANCES ZOFFEL, Appellant.

Walter McGovern for Appellant.

Earl Warren, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

PETERS, P. J.—Defendant appeals from a judgment of conviction finding her guilty of conspiring to commit illegal abortions, and from the trial court's order denying her motion for a new trial. The same indictment charged her with the murder of Doris Alexander, the victim of an abortion. On this charge she was found not guilty. Her co-conspirator, as charged in the indictment, was one Clayton E. May, who was found guilty on both the conspiracy and murder counts. He has not appealed.

As disclosed by the indictment, it was the theory of the prosecution, so far as the conspiracy count is concerned, that May, who formerly was a doctor in the east, but who had been there convicted of the felony of harboring a fugitive from justice, and who, after serving his sentence, came to California but was not here admitted to practice, engaged in a conspiracy with appellant Zoffel, as his nurse, to commit an unlawful abortion on Doris Alexander and other unnamed women in San Francisco. The overt acts set forth in the indictment can be summarized as follows: It is charged that in pursuance of the conspiracy, May and appellant rented and occupied apartment No. 20 in a designated apartment house located on Larkin Street, San Francisco; that subse-

quently they moved to and occupied apartment No. 12 in the same building; that from August, 1937, to April, 1938, the two conspirators paid the rent for said apartment; that May assumed the *alias* of Cy Dalton; that appellant Zoffel assumed the *alias* of Miss Ralston; that they falsely represented appellant Zoffel to be the sister of May; that during the period mentioned, certain window curtains were sent to be cleaned by the conspirators; that they procured and had in their possession certain surgical instruments used for the purpose of causing abortions; that during the period mentioned the two conspirators committed unlawful abortions upon certain women whose names and numbers are unknown; that they did commit an unlawful abortion on one Doris Alexander. The murder count, on which May was convicted and appellant acquitted, charged the unlawful killing of Doris Alexander.

On this appeal it is appellant's main contention that there is not sufficient evidence in this record to sustain her conviction on the conspiracy charge.

The record shows that on April 12, 1938, May performed an unlawful abortion on Doris Alexander in apartment No. 12 of the apartment house named in the indictment, and that as a direct result of the operation Mrs. Alexander died on April 20th in St. Joseph's Hospital in San Francisco. Just prior to Mrs. Alexander's arrival at the hospital on April 12th, one of the physicians there received a telephone call from an unidentified woman telling him that a doctor had just completed an operation on a patient and that some damage had been done to her uterus. The doctor told the woman to have the patient sent to St. Joseph's Hospital. Mrs. Alexander was admitted to the hospital on the evening of April 12th, and as a result of the story she told her husband and the police, May was arrested in the apartment on the afternoon of April 13th. In the apartment were found a table fixed up as an operating table and many surgical instruments and medicines used for performing abortions. There was also discovered in the kitchen of the apartment parts of a human fetus about three or four months old, which was not the fetus taken from Doris Alexander. The prosecution made no attempt to connect this fetus with an unlawful abortion. After his arrest, May was taken to the hospital where Mrs. Alexander at least partially identified him. It should be here mentioned that, although Mrs. Alexander, during the eight

days she was in the hospital, talked to her husband, the police, and hospital employees, there is no evidence that she ever mentioned that Mrs. Zoffel or any other woman participated in the abortion, was present when it was performed, or had anything to do with it. At no time did she mention Mrs. Zoffel, or indicate that she knew her.

Mrs. Zoffel, although known to the police, being then on probation following a conviction of the crime of conspiracy to commit abortions, was not arrested until April 20th, the day Mrs. Alexander died. At the time of her arrest, and at all times since her arrest, she has consistently maintained her innocence.

Respondent contends there was ample evidence to prove both the conspiracy charged, and appellant's participation therein. In this connection the following evidence is relied on:

May took the stand in his own defense. He denied that he had committed any abortions, but admitted that he had entered into a conspiracy with his nurse to practice medicine without a license. Obviously, proof of conspiracy to commit that crime is no evidence of conspiracy to commit the crime charged, namely, conspiracy to commit abortions. He further testified that the name of his nurse was Evelyn Fontaine and that she was not the defendant Zoffel whom he denied knowing. He further testified that he had come to San Francisco in April, 1937, after completing his sentence for harboring John Dillinger; that the notoriety resulting from that conviction induced him to change his name to Dalton; that he was engaged in the business of promoting a feminine hygiene tablet; that at a party on Bush Street he was introduced to Evelyn Fontaine by a former eastern acquaintance, Mrs. Luella Johnson; that he told Miss Fontaine of the tablet; that she told him she knew he had treated many cases of venereal diseases, and asked him if he wanted her to send him some work; that after seeing her several times he agreed to rent the apartment and to treat the cases brought to him; that about three months after meeting Evelyn they began to live together and moved from apartment No. 20 to apartment No. 12, a larger apartment; that Evelyn had brought him forty-five or fifty cases to treat; that she had left the apartment about fifteen minutes before the police arrived on April 13th to arrest him; that he did not know where she had gone

and had not since heard from her. He denied committing the abortion on Doris Alexander, but admitted a woman came to his apartment on the afternoon of April 12th; that she told his nurse an abortion had been committed by another doctor; that he told his nurse to tell the woman to go to the hospital for treatment. He denied that Evelyn Fontaine and Frances Zoffel were the same person, and he denied any acquaintanceship with the defendant. He did admit a friendship with Mrs. Zoffel's son by a former marriage—Raymond Brandt. He testified that he first met Brandt when the latter was working as a bartender at a bar near his apartment; that later Brandt had a laundry route and handled his laundry; that Brandt became interested in the hygiene tablet; that Brandt offered to put up a thousand dollars; that Brandt deposited the money in the bank subject to May's approval of a contract; that the contract was not approved; that May knew Brandt was getting the money from his mother; that he had arranged with Brandt to have his mail sent to an address given him by Brandt, which the evidence shows was the residence of appellant and not Brandt's home. In the apartment at the time of his arrest was found a letter addressed to Cy Dalton, the envelope containing the address of appellant. May testified that this letter had been delivered to him by Brandt.

It is obvious from this summary of May's testimony that, although he admitted entering into a conspiracy with his nurse to violate the Medical Practice Act, there is not one word therein which directly or indirectly tends to prove that a conspiracy to commit abortions had been entered into by May and his nurse, or that Mrs. Zoffel was his nurse. The fact that much of May's testimony may have been false in no way can serve to prove as against Mrs. Zoffel either the fact of the existence of the conspiracy charged, or Mrs. Zoffel's connection therewith.

Also in the apartment at the time of May's arrest were found certain cards which were admitted into evidence over appellant's vigorous protests. These cards were three in number. The first was a Christmas card with the words: "The Zoffels—Rudolph and Frances" printed thereon, and underneath in handwriting the message, "Dalton, I sincerely hope you get a good deal of pleasure of this robe. Rud and Fran, December 25, 1937." Another Christmas card had the

name, "Frances Zoffel" printed on it, and in handwriting the message: "Same hope that you get a lot of comfort and pleasure too out of these slippers." The third card was a birthday card which contained the message: "To Cy from Rud and Frances December 28, '38." May explained that these cards came in presents from Brandt. The prosecution did not produce Brandt as a witness, made no attempt to prove that the cards came from appellant, were similar to cards used by her, or that the handwriting thereon was that of appellant. ■ Respondent contends that such cards were admissible as against appellant, and that her failure to take the stand and deny having written them raises some kind of a presumption or inference of guilt. The burden rests on the prosecution and not the defense. Section 13 of article I of the state Constitution, permitting the prosecution to comment on the failure of the defendant to take the stand, cannot be used to supply a failure of proof by the prosecution.

In an attempt to supply the necessary foundation for the introduction of these cards as against appellant, the respondent refers to a portion of the record showing an argument between the prosecutor and appellant's attorney over the admissibility of the exhibits, wherein appellant's counsel stated that he did not know whether the exhibits were in Mrs. Zoffel's handwriting, but that would come out in due time; that if they were in her handwriting he would frankly admit it. It is contended by respondent that such remarks were tantamount to an admission that the cards were in appellant's handwriting. This conclusion is obviously unsound. Mrs. Zoffel was not present when the cards were found, was not proved to have ever been in the apartment, and no evidence was offered that they were in her handwriting. As to Mrs. Zoffel, until they were further connected up, the cards were clearly hearsay. Respondent also argues that the cards were admissible under the doctrine of the "footprint" cases, citing *People* v. *McCurdy*, 68 Cal. 576 [10 Pac. 207], and *People* v. *Dwyer*, 24 Cal. App. (2d) 639 [75 Pac. (2d) 653]. In both of these cases footprints found near the crime were connected up with the footprints of the accused. Under such circumstances they were clearly admissible. ■ The fallacy of respondent's argument is that here the cards were not connected up with appellant. While it is true that, in a conspiracy case, evidence is admissible that those charged with being co-con-

spirators were intimate, at least where acquaintanceship is denied (*People* v. *Childs,* 127 Cal. 363 [59 Pac. 768]), that rule is not applicable to these exhibits, for the reason that the evidence proving intimacy must conform to established rules of evidence. These cards were improperly introduced as against appellant.

■ Also in the apartment were found various articles of feminine wearing apparel. No attempt was made to connect this clothing with appellant. The prosecutor in his argument to the jury admitted they had not been connected up to appellant. The other articles and cards found in the apartment were not connected up to appellant and need not be separately mentioned.

There is, however, in the record competent evidence from which the jury could infer that May and Mrs. Zoffel were acquainted. The proprietor of a grocery store, a bartender, and a restaurant man testified that Mrs. Zoffel was seen in the neighborhood of May's apartment on various occasions. The proprietor of the grocery store testified he saw Mrs. Zoffel in his store on several occasions; that she purchased fruit juices, bread and milk. Some cans of fruit juices were found in the apartment. The proprietor of a bar near the apartment testified that both May and appellant visited his bar on occasion; that he could not remember ever seeing May and appellant there together; that Raymond Brandt, Mrs. Zoffel's son, formerly worked in the bar. The proprietor of the restaurant which is located near the apartment testified that appellant visited his place several times as did May; that on two or three occasions May and Mrs. Zoffel sat together; that they did not come in or go out together; that each paid his or her own check; that he never had seen or heard them talking together; that the booths were open, and customers who were unacquainted frequently sat together. This testimony, while material and relevant, does no more than create an inference that May and Mrs. Zoffel were acquainted. It does not of itself prove the existence of a conspiracy between them. It served to rebut May's contention he had never seen or known Mrs. Zoffel, but in this connection it should be mentioned that there is no evidence at all that Mrs. Zoffel ever denied to the police or anyone else that she was acquainted with May.

In an attempt to place appellant in the apartment house, the prosecution produced the manager of the apartment house,

and her husband, Mr. and Mrs. Nicholson, and Inspector Engler of the homicide detail who had arrested appellant on April 20th. Mrs. Nicholson testified that May first occupied apartment No. 20, and later apartment No. 12; that May had a woman there by the name of Miss Ralston whom he represented to be his sister; that although the defendant resembled that woman, that Miss Ralston was thinner, younger and smaller. She not only failed to identify Mrs. Zoffel as the woman who was in May's apartment, but the respondent concedes that a fair reading of her testimony demonstrates that she testified Mrs. Zoffel and Miss Ralston were not the same person. Mr. Nicholson also failed to identify Mrs. Zoffel as the woman in May's apartment. He testified that he had only seen the woman who represented herself as May's sister on one occasion in a dark hall; that although Mrs. Zoffel resembled the woman he knew as Miss Ralston, she couldn't be the same woman because Mrs. Zoffel is much older; that he couldn't identify Mrs. Zoffel. This testimony apparently was a surprise to the prosecution because the Nicholsons, prior to the trial, had identified appellant as the woman seen around the apartment. Inspector Engler testified that after he had arrested appellant on April 20th he brought her to the apartment; that both Mr. and Mrs. Nicholson had identified her as Miss Ralston and that appellant had immediately denied the accusation. ▮▮▮ Obviously, the out of court accusation made by the Nicholsons was not evidence of the truth of that accusation. When an out of court accusation is made, it is not the accusation, but the conduct of the accused that is evidence, and the accusation is merely admitted to explain the conduct of the accused. Where the accused denies the accusation, the accusation should not be admitted at all, unless admissible on other grounds. (*People* v. *Teshara*, 134 Cal. 542, 544 [66 Pac. 798]; *People* v. *Weber*, 149 Cal. 325, 338 [86 Pac. 671].) ▮▮▮ While, under proper circumstances, where the prosecution is both surprised and damaged, testimony that a prosecution witness made out of court inconsistent statements may be admissible for impeachment purposes (secs. 2049 and 2052, Code Civ. Proc.), the evidence so admitted is solely for impeachment, and does not prove the facts contained in the inconsistent statements. (27 Cal. Jur. 169, sec. 143.) This rule applies with particular force to the present case. Aside from the out of court identification of defendant

made by the Nicholsons, which they repudiated at the trial, there is no evidence at all placing appellant in the apartment house. There is evidence, already referred to, that she was seen in the general neighborhood, and also evidence from which it might be inferred that May and appellant were acquainted, but there is no evidence at all placing appellant in the apartment where the alleged conspiracy took place.

The only direct evidence connecting appellant with the deceased came from the witness J. L. DuFour. He testified that he was a cab driver for the Bonded Cab Company; that on April 12, 1938, he picked up a fare at Turk and Larkin Streets, which is within a half block of May's apartment; that he took the fare to St. Joseph's Hospital; that the call came in at ten minutes to six; that upon arriving at the intersection of Turk and Larkin Streets he saw two women; that before he could get out of the cab one of the women was inside and said, "St Joseph's Hospital", and that the other said, "Well, goodbye and good luck"; that the woman who got into the cab was the deceased Doris Alexander; that appellant herein was the other and older woman. The respondent concedes that such evidence merely tends to prove that appellant was an accessory after the fact. Standing alone it neither proves the conspiracy charged nor appellant's connection therewith.

On cross-examination of DuFour, the defense produced a statement signed by him in which he stated that he was not sure of the identification made by him, and that he could not now identify the appellant. DuFour admitted that he signed the statement, but contended he signed it for a "friend" and did not read all of it. The prosecution then produced as its witnesses the two men who had secured the statement. The first was an employee of appellant's attorney. He testified that after the coroner's inquest he searched for and found the taxi driver; that he told him who he was and engaged him in conversation; that he told DuFour to tell him the truth; that DuFour then told him the facts contained in the written statement; that he took notes of the conversation; that he prepared the written statement from these notes and took it back to DuFour; that DuFour refused to sign it. The second prosecution witness was Frank Woodmansee, a real estate broker who had known DuFour's family as a result of a business transaction. He testified that appellant's attorney had asked

him to get the truth from DuFour; that he had approached DuFour; had discussed the matter with him; that he had told him to tell the truth, and to sign the statement if it were true; that after reading it DuFour signed the statement.

It should be here mentioned that appellant produced several alibi witnesses, including her mother, a friend from Stockton and a San Francisco friend. The mother testified she had dinner with her daughter and Mrs. Pemberton from Stockton on April 12th, and had been with her daughter and Mrs. Pemberton that afternoon and evening. Mrs. Pemberton testified she came from Stockton to stay with Mr. and Mrs. Zoffel on April 10th; that on April 12th she and Mrs. Zoffel went shopping in the afternoon and that she had dinner with Mrs. Zoffel and her mother that evening; that she was with appellant all that day and night. The San Francisco friend— Mrs. Sadler—testified that on April 12th at twenty minutes or quarter to six she phoned Mrs. Zoffel at her home and had a conversation with her concerning the possibility of Mrs. Zoffel joining a lodge.

It should also be mentioned that Mrs. Luella Johnson was produced as a witness. She testified she had known May for over twenty years; that she had known him in the east; that she also knew Evelyn Fontaine; that she had introduced Evelyn to May at a party on Bush Street; that Evelyn and appellant were not the same person. The jury, apparently, as was their province, did not believe these witnesses.

This constitutes a fair summary of the evidence so far as it pertains to the conspiracy charge, and appellant's alleged connection therewith. As will be seen therefrom, there is no direct or circumstantial evidence connecting appellant with the conspiracy charged. At most, the evidence raises but a suspicion of guilt. After reading the record we are convinced that there is not sufficient direct or circumstantial evidence to support the conviction of appellant. There is sufficient evidence from which the jury could infer that May and Mrs. Zoffel were acquainted, and, conceding that the evidence shows that May conspired with someone to commit abortions, there is no admissible evidence at all from which a reasonable inference could be drawn that Mrs. Zoffel conspired with him for that purpose. The testimony of DuFour tended to connect Mrs. Zoffel with Doris Alexander after the abortion was committed. That evidence standing alone, as

already stated, while raising a suspicion, does not prove directly or indirectly the fact of a conspiracy or appellant's participation therein. It is true that appellant may be guilty, but at best the evidence does no more than raise a mere suspicion. It is our opinion, that, tested by every reasonable standard, the evidence is insufficient to sustain the conviction on the conspiracy charge.

For the foregoing reasons the judgment and order denying a new trial are, and each is, reversed, and the cause remanded for a new trial.

Knight, J., and Ward, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 4, 1939, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 16, 1939. Shenk, J., Curtis, J., and Gibson, J., voted for a hearing.