[L. A. No. 21155. In Bank. Apr. 4, 1950.]

HARRY M. LORENSON, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent.

Russell E. Parsons for Petitioner.

Harold W. Kennedy, County Counsel, Wm. E. Lamoreaux, Deputy County Counsel, W. E. Simpson, District Attorney, Jere J. Sullivan and Robert Wheeler, Deputy District Attorneys, for Respondent.

EDMONDS, J.—Harry M. Lorenson and 12 other persons were indicted for conspiracy to commit robbery, to commit assault with a deadly weapon and to pervert or obstruct justice or the due administration of the laws. The present pro-

ceeding to restrain the superior court, by writ of prohibition, from proceeding with the trial of the action, is prosecuted chiefly upon the ground that there was insufficient evidence before the grand jury to show that Lorenson committed any crime.

From the testimony presented to the grand jury, it appears that Alfred Pearson was the principal employee of the Sky Pilot Radio Shop located in a residential district of Los Angeles. His general reputation as an unreliable businessman was not bettered by newspaper publicity to the effect that he had obtained title to the home of a Mrs. Phillips by legal proceedings arising out of a controversy over a repair bill of less than $10. The accounts of his dealings with Mrs. Phillips, coupled with stories of his assertedly unfair business practices in other transactions, had brought about a general wave of indignation in the neighborhood.

For some time prior to Pearson's difficulties with Mrs. Phillips, Lorenson, a captain in the Police Department of Los Angeles, had been assigned to duty with the police commission. He had directed the arrest and prosecution of Pearson on several criminal charges. Pearson was acquitted in each of these cases with the exception of one in which he was fined $500 for a violation of the federal law administered by the Office of Price Administration.

Each man intensely disliked the other. At one time Pearson sued Lorenson and several other persons, claiming damages because of an asserted conspiracy to ruin his business. Lorenson made no effort to conceal his ill will toward Pearson and repeatedly voiced his hatred and enmity toward the radio man.

"Mickey" Cohen is a shadowy character in this picture of the situation at the time of the events which are the basis for the challenged indictment. According to testimony presented to the grand jury, Cohen is a well-known hoodlum of Los Angeles and a generally nefarious individual. The indictment is based upon evidence tending to show that Lorenson interested himself in Mrs. Phillips' difficulties with Pearson and enlisted as aids in his purpose to help her and punish Pearson, a lawyer and seven of "Mickey's" henchmen.

The overt acts of Lorenson and those indicted with him took place within about 24 hours before a severe beating of Pearson on a Saturday afternoon. The story commences with a conversation between Lorenson and Jerome Weber, an attorney, which took place the previous morning. (See *Weber* v.

*Superior Court, post,* p. 68 [216 P.2d 871].) At that time, Lorenson asked Weber whether he would represent Mrs. Phillips in a suit to set aside the sale of her home to Pearson. When Weber agreed to act as her attorney, Lorenson stated that he would talk with Mrs. Phillips and make an investigation for the purpose of obtaining facts to be used in the prosecution of the action.

Lorenson then went to the Wilshire Police Station and discussed Mrs. Phillips' case with Acting Captain Swan. While commenting upon Pearson, Swan remarked that if Pearson came to the Wilshire Station he would be thrown down the stairs. Lorenson then called upon Mrs. Phillips, telling her he was sure her home could be recovered and that Jerome Weber would do the legal work without charge. Lorenson then saw Weber, who said he would take the case without fee.

. In the afternoon, Lorenson received a telephone call from an unknown person who told him that there would be pickets in front of Pearson's store the next day carrying banners stating in substance: ''Don't patronize Mr. Pearson. He took a widow's home away for this repair bill, eight [or] nine dollars.'' Lorenson made no official report of this conversation.

On the following morning, James Rist, one of Cohen's associates, ordered four signs painted with wording to the effect that Pearson had taken a widow's home for a $9.00 repair bill. The signs were delivered to Rist about 10 a. m. of that day.

Less than one hour later, Rist with David Ogul visited the radio shop and asked for Pearson. He was not there. When they found him in the shop about 2 :30 p. m., they told him that they represented a magazine and wished to hear his version of the controversy between him and Mrs. Phillips. As they were unable to identify themselves, Pearson ordered them to leave. When Rist objected, Pearson threatened to call the police, stating at the same time that a recording had been made of their conversation. Ogul and Rist then left.

At 3 :15 p. m., Pearson received a telephone call from someone who represented himself as the editor of a Los Angeles newspaper. The supposed editor apologized for the conduct of Ogul and Rist, stated that they were reporters for his paper and requested an interview on their behalf. Pearson agreed to an interview with the same or other reporters. As was his custom, Pearson made a recording of this conversation.

About 30 minutes later, Rist and Ogul, with Eli Lubin and another person, returned to the radio shop. One of the men carried a camera. Pearson informed them of the conversation

with the editor and said that he would give them an interview. He then played a portion of the recorded telephone conversation for them. When Pearson invited the four men behind a partition where the recording device was located, without any warning, they beat him about the head and body with a gun, clubs, iron rods and other heavy objects. Pearson's arm was broken and his head cut in five places. They tore telephones from the wall and after taking the machine which contained the record of the conversation with the "editor," made their escape in an automobile which was double-parked in front of the store.

Because of a minor traffic violation, officers in a passing patrol car gave chase. Tire irons, a gun, and a riding crop were thrown from the speeding car. In response to a radio call for assistance, four police cars responded. When the automobiles was overtaken, the officers found that it had seven occupants, Rist, Ogul and Lubin, Frank Niccoli, Louis Schwartz, Harold Meltzer, and Edward Herbert, all associates of Cohen. After the men were arrested and while they were being searched, an amateur photographer took pictures of the party. The officers with their prisoners arrived at the Wilshire Station about 4:25 p. m.

At approximately 4:10 p. m., which places the conversation just at the time of the beating of Pearson and the pursuit of the men who had attacked him, Jerome Weber called the Wilshire Station and asked if anyone had been arrested in connection with a disturbance at Pearson's place of business. Upon being informed by Officer Barkley that no such person had been brought in, Weber requested that the booking of any one arrested on that charge be delayed until he had arrived at the station. Burton Mold (see *Mold* v. *Superior Court, post,* p. 73 [216 P.2d 874]) interrupted Weber's conversation and asked Barkley, to whom he was known, if Dave Ogul and two others, whom he named, had been arrested because of a disturbance of the peace or a fight. When he was told that they were not at the station, Mold asked Barkley to extend every courtesy to Weber, as he and Weber were very good friends.

Just before Weber and Mold were talking with Barkley, Lorenson received a telephone call at his home from a man who identified himself as a newspaper reporter. Lorenson stated that he thought that his caller gave the name of Beacon or Bacon, but no reporter having either name was ever located,

The alleged reporter asked Lorenson, "Have you heard about any trouble out at Pearson's, the Sky Pilot radio repair man?" Lorenson replied that he had not, and the supposed reporter said, "I understand he got beat up and they took him to the station." According to the testimony of Lorenson fixing the time of this conversation, it occurred before the seven arrested men reached the station. No report of the incident had then been made by the arresting officers. Lorenson then called the Wilshire Station and spoke to the desk sergeant and Officer Shea of the detective bureau. After asking Shea if any arrests had been made of pickets at Pearson's radio shop, Lorenson said, "It would be too bad if some pickets got in trouble by being pushed around or getting pushed around at Pearson's place."

Within a few minutes after the arrested men arrived at the Wilshire Station, Acting Captain Swan, with whom Lorenson had discussed the Pearson case on the day before, called from his home concerning the arrest. When he was informed that arrests had been made, Swan had the names of the men read to him, and asked if they had any connection with the Sky Pilot Radio Shop. He was told that the arrests concerned Pearson's business. Swan then gave instructions to immediately release the prisoners and get them out of the station without attracting attention before Pearson could arrive to identify any of them.

In this conversation Swan directed that the tire irons, guns, recording device, and other objects which had been turned in as evidence, be returned to the prisoners. He also ordered Officer Wolfe, on duty at Wilshire Station, to caution the arresting officers not to talk about the incident. Wolfe accordingly informed those officers that they should destroy their notes concerning the arrest, say nothing about the incident and, if questioned, deny that an arrest had been made. Wolfe told the officers that the release was being effected because of a captain connected with the police commission who had a grudge against Pearson.

Swan subsequently informed one of the Los Angeles newspapers that no arrests had been made as a result of the Pearson beating, adding that he knew nothing of the affair. He later stated that some legitimate businessmen, all of whom had permits to carry guns, had been arrested by mistake but had been released. When Mrs. Pearson appeared at the Wilshire Station to identify the prisoners, she was informed by

Swan that no prisoners had been brought in and that no arrests had been made.

Some hours later, Swan telephoned to Lorenson and told him of Pearson's claim that he had been attacked as the result of Lorenson's activities. He also stated that the arrested men had been released. At no time during this conversation did Lorenson inquire as to why the men were released without being booked.

Despite Swan's instructions to the arresting officers to deny the arrest, and Cohen's attempts to purchase the pictures taken on the street at the time the seven men were being searched, photographs of the group were published in a newspaper with a story concerning the Pearson affray. Shortly afterward, the district attorney presented all of this testimony, with Pearson's account of the attack upon him, to the grand jury, which returned an indictment against Lorenson, Swan, Wolfe, Weber and Mold. Cohen and the seven men arrested when the automobile in which they endeavored to escape was overtaken were also named as defendants.

Lorenson attacks this indictment principally upon the ground that there was no evidence presented to the grand jury which connects him with the conspiracy in which he is asserted to have been a participant. He declares that the evidence shows no conduct by him which constitutes a crime, and that he should not be required to stand trial upon the charge against him.

An indictment is but an accusation, presented by the grand jury to a competent court, charging a person with a public offense. (Pen. Code, § 917; *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713] ; *People* v. *Goldenson,* 76 Cal. 328 [19 P. 161].) ▮ The duty of determining whether or not an indictment should be found is lodged exclusively in the grand jury and not in the courts. The Legislature has stated that duty as follows : ''The grand jury ought to find an indictment when all the evidence before them, taken together, if unexplained or uncontradicted, would, *in their judgment,* warrant a conviction by a trial jury.'' (Pen. Code, § 921; emphasis added.) A court may not substitute its judgment as to the weight of the evidence for that of the grand jury. ''If there is some evidence to support the indictment, the courts will not inquire into its sufficiency (see cases collected in 59 A.L.R. 573).'' (*Greenberg* v. *Superior Court, supra.*)

▮ At common law, and for many years in this state, an

indictment returned by a grand jury was unimpeachable. (*People* v. *Tinder*, 19 Cal. 539 [81 Am.Dec. 77]; see *In re Kennedy*, 144 Cal. 634 [78 P. 34, 103 Am.St.Rep. 117, 1 Ann. Cas. 840, 67 L.R.A. 406].) But in the Greenberg case this court considered a transcript of the testimony before the grand jury which included no evidence even remotely supporting the charges made in the indictment. The court held that ''when *no* evidence has been presented to connect him with the commission of the crime charged . . ., unless there is *some* rational ground for *assuming the possibility* that he is guilty,'' the indictment is void and it confers no jurisdiction upon a court to try him for the offense. (Emphasis added.)

In the Greenberg case, the defendants were charged with conspiracy to defraud an insurance company. There was no evidence presented to the grand jury concerning Greenberg which, directly or indirectly, tended to show any act by him either connected or unconnected with the alleged conspiracy. The sole evidence relating to Greenberg was the nonresponsive answer of an insurance investigator who stated: ''. . . I have heard the name Greenberg.'' The decision holding the indictment to be void because it was unsupported by any evidence has in no way restricted the discretion placed in the grand jury by section 921 of the Penal Code. Rather, the court expressly recognized that exclusive discretion, and condemned only ''arbitrary indictments unsupported by any evidence.''

By section 995 of the Penal Code, an information, and, since 1949 an indictment, ''must be set aside by the court [if the defendant] has been indicted without reasonable or probable cause'' or ''committed without probable cause.'' The term ''probable cause,'' as used in this connection, was defined in *People* v. *Nagle*, 25 Cal.2d 216, 222 [153 P.2d 344], in which it was pointed out that the evidence which will justify a prosecution need not be sufficient to support a conviction. As stated by Justice Carter, ''Section 872 of the Penal Code provides that the defendant must be held to answer if 'it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof.' Section 1487(7) of the Penal Code provides that a party is entitled to discharge upon habeas corpus proceedings where he has 'been committed on a criminal charge without reasonable or probable cause'; 'sufficient cause,' therefore, means no more than that. (*People* v. *Putnam*, 20 Cal.2d 885 [129 P.2d 367]; *Cleugh* v. *Strakosch* (C.C.A. 9), 109 F.2d 330; *In re Martinez*, 36 Cal.App.2d 687 [98 P.2d 528].) 'Rea-

sonable or probable cause' means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. 'Reasonable and probable cause' may exist although there may be some room for doubt.''

■ From the facts upon which the indictment of Lorenson is based, certain inferences reasonably may be drawn. The grand jury could infer from the events which transpired that an understanding or agreement had been entered into among Lorenson, Cohen and his associates, Weber, Mold, Swan and other members of the police department, to assault and rob Pearson and also to obstruct the administration of justice in the litigation between him and Mrs. Phillips. Certainly the evidence justifies the conclusion that the recording machine was stolen from Pearson in order to protect those persons who took part in the conversations which were recorded. Also, the inference reasonably may be drawn that Lorenson and police officers of the Wilshire Station were to furnish protection to the participants in the conspiracy by refusing to disclose the identity of Pearson's attackers, if they were arrested, and to effect their release from custody. The conduct of Lorenson, Weber and Mold subsequent to the arrest may well have been in furtherance of the conspiracy and to carry out its unlawful object, as well as to protect the parties to it from detection.

The telephone conversations, considered in their relation to the time when the beating was administered to Pearson, fit into a common scheme or plan by Lorenson, Weber, Mold and the arrested men. The grand jurors had a right to disbelieve explanations or denials of the defendants (*McFarland* v. *Superior Court,* 88 Cal.App.2d 153 [198 P.2d 318]), and the evidence presented in connection with the attack upon Pearson was ample to justify at least the suspicion that the crime charged in the indictment had been committed by Lorenson and the other persons named in it.

■ Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. ''[i]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the

facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole. (*People* v. *Jones,* 136 Cal.App. 722 [29 P.2d 902] ; *People* v. *Benenato,* 77 Cal.App.2d 350 [175 P.2d 296].)'' (*People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065].)

According to Lorenson, the grand jury should have concluded that the seemingly related events were unconnected and occurred by mere happenstance. But assuming that the facts are consistent with such a construction of them, the conduct shown by the record does not, as a matter of law, require it. Certainly it cannot be said that there is no basis for a strong suspicion of guilt. Such a conclusion is not unreasonable nor one which could not be held by a man of ordinary caution or prudence. The testimony as to the events shown by the record provide the basis for an inference that there was a broad plan in which Lorenson was an active participant. ''Without explanation or contradiction of those facts by the defendant, . . . and which the grand jury had a right to disbelieve, the jurors had the discretion to determine, 'in their judgment' whether the evidence would 'warrant a conviction by a trial jury.' In that event . . . the jury 'ought to find an indictment,' as it did. We may not interfere with that discretion of the grand jury, or weigh the evidence adduced to determine its sufficiency.'' (*McFarland* v. *Superior Court,* 88 Cal.App.2d 153, 158 [198 P.2d 318].)

The petitioner relies upon the statement in *Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153 [183 P.2d 724], to the effect that mere association does not make a conspiracy; there must be evidence of some participation or interest in the commission of the offense. But the only links connecting Dong Haw with the alleged conspiracy was his parental relation to the other actors, his ownership of the building in which a Chinese Social Club was located, and ownership of a truck used to deliver some liquor. Other than as landlord, he had no connection with the club which was being closed by police order, and it affirmatively appeared that a letter bearing his name was not signed by him or with his knowledge or consent. There was no evidence, direct or circumstantial, tending to prove that Dong Haw had ever participated in the bribery, if that crime was committed, or from which it reasonably might be inferred that he was interested in obtaining any favor from the police department.

In the present case, Lorenson's acts may well have been in furtherance of a common plan to accomplish an unlawful pur-

pose. A conclusion that the conversations and the arrangements made by him were not merely a series of strange coincidences, but a part of that plan, has much more foundation than mere suspicion Indeed, it is a logical inference which reasonably may be drawn from the testimony regarding his conduct in connection with that of the other persons named as conspirators. Here it cannot be said, as in the Greenberg case, that there is ''no evidence even remotely supporting the charges made against petitioner''; on the contrary, there is some ''rational ground for assuming the possibility that he is guilty.'' Clearly, the indictment of Lorenson is not ''unsupported by any evidence.''

Lorenson attacks the statute making criminal conspiracy an offense upon the ground that it is so vague and uncertain as be violative of the constitutional requirements of due process. He also contends that the indictment is equally vague and indefinite.

Section 182 defines as criminal conspiracy acts committed with the purpose ''. . . to pervert or obstruct justice, or the due administration of the laws.'' ■ Generally speaking, conduct which constitutes an offense against public justice, or the administration of law includes both malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations. Such an offense was recognized at common law and generally punishable as a misdemeanor. Now, quite generally, it has been made a statutory crime and, under some circumstances, a felony. (Burdick, Law of Crimes [1946], vol. 1, p. 382 et seq.; 20 Cal.Jur. 347-354.)

■ In California, the statutes relating to ''Crimes Against Public Justice'' are found in part I, title VII, of the Penal Code. Bribery, escapes, rescues, perjury, falsifying evidence, and other acts which would have been considered offenses against the administration of justice at common law are made criminal by legislative enactment. Section 182, subdivision 5, is a more general section making punishable a conspiracy to commit any offense against public justice. The meaning of the words ''to pervert or obstruct justice, or the due administration of the laws'' is easily ascertained by reference either to the common law or to the more specific crimes enumerated in part I, title VII. A conspiracy with or among public officials not to perform their official duty to enforce criminal laws

is an obstruction of justice and an indictable offense at common law. (*People* v. *Tenerowicz,* 266 Mich. 276 [253 N.W. 296].) In the same category is a conspiracy to obtain the release of a person charged with a felony by presenting a worthless and void bail bond. Such a conspiracy has been held to be a perversion of the due administration of the law, and an offense within the meaning of subdivision 5 of section 182 of the Penal Code. (*People* v. *Ambrose,* 31 Cal.App. 460 [160 P. 840].)

To comply with the constitutional requirement of due process of law, the crime for which a defendant is being prosecuted must be clearly defined, but it is only necessary that the words used in the statute be well enough known to enable those persons within its reach to understand and correctly apply them. ''To make a statute sufficiently certain to comply with constitutional requirements it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited.'' (*People* v. *Smith,* 36 Cal.App.2d Supp. 748, 752 [92 P.2d 1039].)

Although higher standards of certainty will be required of penal than of civil statutes (*Levy Leasing Co.* v. *Siegel,* 258 U.S. 242 [42 S.Ct. 289, 66 L.Ed. 595]), a statute is sufficiently certain if it employs words of long usage or with a common law meaning, ''notwithstanding an element of degree in the definition as to which estimates might differ.'' (*Connally* v. *General Const. Co.,* 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]; *International Harvester Co.* v. *Kentucky,* 234 U.S. 216 [34 S.Ct. 853, 58 L.Ed. 1284]; *Nash* v. *United States,* 229 U.S. 373 [33 S.Ct. 780, 57 L.Ed. 1232].) For example, the courts have upheld statutes employing such terms as: ''to make diligent effort to find the owner'' (*Pacific Coast Dairy* v. *Police Court,* 214 Cal. 668 [8 P.2d 140, 80 A.L.R. 1217]); ''unreasonable speed'' (*Ex parte Daniels,* 183 Cal. 636 [192 P. 442, 21 A.L.R. 1172]); ''unjustifiable physical pain or mental suffering'' (*People* v. *Curtiss,* 116 Cal.App. Supp. 771 [300 P. 801]); ''practice law'' (*People* v. *Ring,* 26 Cal. App.2d Supp. 768 [70 P.2d 281]); and ''to the annoyance of any other person'' (*People* v. *Beifuss,* 22 Cal.App.2d Supp. 755 [67 P.2d 411]).

Considering the well-settled meaning at common law of the words ''to pervert or obstruct justice or the due administration of the laws,'' the other and more specific provisions in the Penal Code concerning ''Crimes Against Public Justice,'' and the relative certainty of words employed in statutes

which have been held valid, it cannot be said that subsection 5 of section 182 of the Penal Code is unconstitutional. For substantially the same reasons, the indictment against Lorenson is not vague, indefinite, or uncertain and it complies with the statutory requirement for such an accusation. Section 952 of the Penal Code allows an indictment to be stated ''in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.'' Lorenson was indicted in the terms of the ''enactment describing the offense,'' and the grand jury has fairly informed him of the acts of which he is accused to the extent which will enable him to defend himself. (*People* v. *Emmons,* 13 Cal.App. 487, 492 [110 P. 151].)

The petition for the peremptory writ of prohibition is denied, and the alternative writ is discharged.

Shenk, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The factual basis on which it is sought to hold petitioner may be outlined as follows: Alfred Pearson worked in a radio store in Los Angeles. He became heartily disliked by the people in the neighborhood of the store because of his unfair dealings in connection with the repair and sale of radios. Some members of the Los Angeles police force, including petitioner, who were disturbed by complaints made to them concerning Pearson's practices, also disliked him. One particular alleged incident that was highly provocative consisted of the taking by Pearson of a widow's (Mrs. Phillips') home for an $8.09 radio repair bill. The tension created by the public's feeling of animosity was increased by a feature story in a local newspaper concerning that incident. On the afternoon of Saturday, March 19, 1949, Pearson, while at the radio shop, was severely beaten by a group of men, some of whom are the other persons also indicted with petitioner, and are associates of Michael Cohen, a defendant. Those men took a wire recording machine from the shop when they left after the assault and battery inflicted on Pearson. The charge of conspiracy to commit that battery and theft of the recorder arises out of that incident. Apparently the theft of the recording machine is related to an incident occurring earlier the same afternoon when two men (of the assaulting group) made calls on Pearson, representing

themselves as reporters desiring Pearson's side of the story concerning Mrs. Phillips and the loss of her home. Pearson took a recording on the wire recorder of the conversation on those visits and advised his visitors that he had done so.

After leaving the radio shop in a car, the men were pursued by a radio police patrol car, not because of the assault and theft, but for a traffic violation observed by the officers in the patrol car. A gun, tire irons, and other articles were thrown from the pursued car and finally the occupants surrendered and were arrested under menace of the armed officers in the patrol car. The suspects were taken to a police substation (Wilshire Station), and were released after being there a short time. They were not booked, and the articles discarded by them were returned to them. An amateur photographer had taken photographs of the field arrest, and there is evidence that after the release, an attempt was made by Cohen to purchase those pictures from a local newspaper with the idea of suppressing them. The circumstances relating to the release of the suspects, and the attempt to suppress the pictures, constitute the *sole* basis of the charge of conspiracy to obstruct and pervert justice against petitioner and others embraced in the indictment here under attack.

In order to connect petitioner Lorenson (a captain in the Los Angeles police force and assigned to ''downtown'' duty with the police commission) with the conspiracy, the prosecution refers to evidence that Lorenson did not like Pearson; Pearson had sued Lorenson and others charging a conspiracy to ruin his business; at the instance of Lorenson, Pearson had been arrested several times, but Pearson was not convicted except in one case; on the Friday before the day of the assault, Lorenson asked Jerome Weber (see *Weber* v. *Superior Court, post,* p. 68 [216 P.2d 871]), an attorney, to represent Mrs. Phillips in connection with an effort to recover her home and said he would talk to Mrs. Phillips about it, and thereafter went to the Wilshire Substation and talked to the acting captain (Swan) in charge, about Pearson and the Phillips matter; thereafter Lorenson spoke to Mrs. Phillips concerning the employment of Weber and then obtained Weber's agreement to take the case. On Friday afternoon, Lorenson received a telephone call from a person whose name he did not recall, saying there would be pickets at the Pearson Radio Shop the next day publicizing the Phillips affair; however, the call was from Mr. Satchell, representative of the West Adams Merchants' Association, for he testified that he

had called Lorenson that afternoon to inquire whether it would be illegal to peacefully picket Pearson's place. Rist, one of Cohen's associates and a defendant, obtained picket signs Saturday morning. After the suspects had been arrested, but before arriving at the Wilshire Station, Weber called the station and inquired whether anyone had been arrested in connection with a disturbance at Pearson's place and, on being informed that no one had been brought in, requested that he be informed if anyone was, in order that he could come to the station before they were booked. Burt Mold, another defendant (see *Mold* v. *Superior Court, post,* p. 73 [216 P.2d 874]), was at Weber's office at the time and interceded in the telephone conversation to request that courtesies be extended to Weber, he knowing some of the officers at the station, and inquiring as to whether one of the assaulting group (Ogul) had been brought in. About the time of this call, Lorenson received a telephone call from a man representing himself to be a newspaper reporter asking if he had heard of the trouble at Pearson's and he was told of it. He thought the reporter's name was Beacon or Bacon. Lorenson then called the Wilshire Station and asked if they had any pickets from Pearson's and stated that it would be "too bad if some pickets got in trouble by being pushed around or getting pushed around at Pearson's place." Later that afternoon, Lorenson called Benson, a newspaper reporter, and asked what the "deal" was on Pearson. Benson said six men had been arrested and released, to which Lorenson replied "Oh," and said Pearson was no good. The direct cause of the release of the suspects was a telephone order to the station from Acting Captain Swan. The officer at the station (Wolfe) receiving that call told the arresting officers to release the prisoners because "the thing was bigger" than any one of them—that it was done for a captain downtown connected with the police commission who had a grudge against Pearson. The following morning Swan called Lorenson and said Pearson blamed the latter for the attack on him and that the arrested suspects had been released. Lorenson did not ask why they had been released. The photographs of the arrest were shown to Swan by the newspaper having them and he expressed surprise and concern.

In connection with the statement by Officer Wolfe to the arresting officers, it appears that his reference to a "downtown" captain who had a grudge against Pearson *was merely*

*his conclusion from an unrevealed source,* for while the suspects were at this station, he received a telephone call from Acting Captain Swan who was in charge of the station. *(There is no evidence that he was called by Lorenson.)* It was Swan who told him to release the men—get them out of the station quickly and in a manner that they would not be observed. *He did not say anything about a "downtown" officer who had a grudge against Pearson and gave no reason for the release order.* Wolfe said he "gave" them (the arresting officers) what he *thought* was a "logical" explanation for the release order which opinion was based on nothing more than his knowledge that Lorenson did not like Pearson. *He felt that he had to give some explanation to preserve the morale of the force.*

Lorenson's duties *required him to investigate complaints by people claiming to have been cheated and many of such were against Pearson.*

Summarizing, it appears that Lorenson disliked Pearson, this dislike *arising from several incidents occurring in the course of his duties as police officer,* and he was taking some steps to have Mrs. Phillips' interests protected against Pearson's avarice. Thus, the most that may be inferred is that he had a motive to participate in retaliation against Pearson and that he knew something was afoot *(what, does not appear, except possibly lawful picketing)* concerning Pearson, and that he instructed an officer at Wilshire Station that such lawful "pickets" should not be badly treated.

In an endeavor to make a case from the evidence presented to the grand jury, the majority opinion indulges in unsupportable inferences and magnifies certain facts out of proportion to their true significance. For illustration, on the latter score, it is said petitioner "hated" and "intensely" disliked Pearson. There is no evidence of that; only dislike is shown. The arrests of Pearson by petitioner on former occasions carries no imputation of hate. They were made on *complaints by citizens* and in the line of petitioner's special police duties. There is not a scintilla of evidence that petitioner enlisted "the aid of the other defendants to punish Pearson." It is not true that the person who called Lorenson on Friday afternoon about picketing Pearson was unknown. Petitioner merely said he did not recall his name, and, as above stated, the caller was one of Pearson's neighbors, a member of a merchants' association, and one of the group who were incensed at Pearson's dealings. It is said, in connection with petitioner's reference to a call by a reporter concerning trouble at Pear-

son's store, that no such person as "Beacon or Bacon" was shown to be a reporter. Petitioner had no obligation to make such a showing.

The majority infers that the recording machine was taken to protect the persons assaulting Pearson, but that does not connect petitioner with crime. Even if the grand jury may disbelieve petitioner's denials, there still is nothing left. An inference of guilt cannot be deduced from a denial thereof. The majority concedes that there was only a "suspicion" or a "strong suspicion" that petitioner was involved, and then quotes from *McFarland* v. *Superior Court,* 88 Cal.App.2d 153 [198 P.2d 318], that "without explanation or contradiction of those facts," they are enough. But here we have *both explanation and contradiction.* As I said before, we have nothing more than a possible motive on petitioner's part coupled with a foreknowledge that something was going to happen. That foreknowledge was clearly and adequately explained.

Clearly the majority is relying upon nothing more than suspicion which is neither "reasonable or probable cause" as required by the 1949 amendment to section 995 of the Penal Code, nor is it "some" evidence as is required by *Greenberg* v. *Superior Court,* 19 Cal.2d 319 [121 P.2d 713]. While it is true that the evidence before the grand jury need not be equal to that required for a conviction—eliminate all reasonable doubt (see *Greenberg* v. *Superior Court, supra*; *People* v. *McRae,* 31 Cal.2d 184 [187 P.2d 741] ; *People* v. *McGee,* 31 Cal.2d 229 [187 P.2d 706] ; *People* v. *Tallman,* 27 Cal.2d 209 [163 P.2d 857] ; *People* v. *Mitchell,* 27 Cal.2d 678 [166 P.2d 10] ; *People* v. *Nagle,* 25 Cal.2d 216 [153 P.2d 344]), still it must do more than establish a mere conjecture, surmise, or suspicion. As stated in *Dong Haw* v. *Superior Court,* 81 Cal. App.2d 153, 158 [183 P.2d 724], involving a test of an indictment on prohibition: *"Conspiracies cannot be established by suspicions.* There must be some evidence. *Mere association does not make a conspiracy.* There must be evidence of some participation or interest in the commission of the offense."

Statements from *Greenberg* v. *Superior Court, supra,* are urged as support for the claim that any evidence, however tenuous or remote, that may relate both to the petitioner and the crime charged, will support the indictment. I cannot agree with this interpretation of our decision therein. It is true that this court there stated that the testimony before the

grand jury "upon which the indictment was based contains no evidence even remotely supporting the charges made against the petitioner" (19 Cal.2d, at p. 321), and that "If there is some evidence to support the indictment, the courts will not inquire into its sufficiency." (19 Cal.2d, at p. 322.) These statements should not be construed as requiring the denial of the writ whenever any evidence concerning the petitioner has been presented to the grand jury. Evidence that will support an indictment must be relevant to the commission of the crime charged. Evidence that does no more than establish that the petitioner and the alleged perpetrators of the crime knew each other, or that only places the petitioner on the periphery of the events that are the basis of the indictment is no evidence within the meaning of the Greenberg case. (See *Dong Haw* v. *Superior Court, supra,* p. 158.) An indictment is supported by "some" evidence only when that evidence connects the petitioner with the commission of the crime.

We should not lose sight of the fact that this indictment was based on an alleged conspiracy. The only evidence that will support such an indictment is evidence that will connect the petitioner with the "promotion of the venture" that is the basis of the indictment. (*United States* v. *Falcone*, 109 F.2d 579, 581.) Without such evidence, acts done by other persons, with whom there is evidence of petitioner's lawful association, cannot be permitted to support an indictment. In this connection, the remarks of Mr. Justice Jackson in *Krulewitch* v. *United States*, 336 U.S. 440 [69 S.Ct. 716, 723, 93 L.Ed. 790], are particularly pertinent:

"As a practical matter, the accused is often confronted by a hodge-podge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only on the theory that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction . . .

"A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together."

Viewing the evidence most favorable to the prosecution, it can only be said that wrongdoing by someone was established

and that petitioner was in some insubstantial way generally associated with some of the wrongdoers and placed on the periphery of the events that constituted the wrongdoing. Petitioner disliked Pearson because of the latter's alleged unfair practices; he engaged petitioner Weber (*post,* p. 68) to represent a plaintiff (Mrs. Phillips) in a case against Pearson based upon those practices. There is evidence that he was informed that Pearson's shop was going to be picketed by irate housewives. There is no evidence that he knew that the picketing would not be peaceful or that it would not be conducted by housewives. There is evidence that he subsequently learned that the picketing had resulted in injury to someone and the arrest of the pickets, but there is no evidence that he was then aware of their identity or that he took any action to obtain their release as charged in the indictment. None of these acts were unlawful or unusual. They do not constitute even "some" evidence of a conspiracy. The evidence falls short of showing any agreement between petitioner and others to engage in the perpetration of a crime. It does no more than establish that he, among many others besides the conspirators, disliked a person against whom a conspiracy was brewing and that he had some foreknowledge and knew some of the conspirators. There is no evidence within the meaning of the Greenberg case. (See *People* v. *Yant,* 26 Cal.App.2d 725, 736 [80 P.2d 506] ; *People* v. *Rodriguez,* 37 Cal.App.2d 290 [99 P.2d 363] ; *People* v. *Zoffel,* 35 Cal.App.2d 215 [95 P.2d 160] ; *People* v. *Weber,* 7 Cal.App.2d 620, 622 [46 P.2d 222] ; *People* v. *Jordan,* 24 Cal.App.2d 39, 51 [74 P.2d 519] ; *People* v. *Long,* 7 Cal.App.2d 27 [93 P. 387] ; *People* v. *Stevens,* 68 Cal. 113 [8 P. 712] ; *People* v. *Savinovich,* 59 Cal.App. 240 [210 P. 526].)

Turning to the statutory requirement of reasonable or probable cause (Pen. Code, § 995), we find the general rule stated: "The term 'probable' has been defined to mean 'having *more evidence for* than against; supported by evidence which inclines the mind to believe, yet leaves room for doubt.' . . . In other words, to authorize a committing magistrate to hold a defendant to answer, the facts which are stated before him must induce a reasonable *probability* that all the acts have been done which constitute the offense charged, that the crime charged was committed by the accused, . . ." (7 Cal.Jur. 982.) [Emphasis added.] *Not only is there not more evidence for guilt than against,* but there is none of guilt.

The majority opinion in this case holds that "suspicion" or "possibility of guilt" is all that is required to support a grand jury indictment. This is akin to holding that guilt by association should be the rule, instead of the philosophy underlying all American jurisprudence that before a person can be charged with crime, there must be reasonable and probable cause as a basis for such charge.

As there is no evidence whatever connecting petitioner with the crime charged in the indictment in this case, I would grant the writ of prohibition prayed for.

Gibson, C. J., and Traynor, J., concurred.