Filed 12/3/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JESSE GARCIA,<br><br>    Defendant and Respondent. | H043537<br>(Santa Clara County<br>Super. Ct. No. C1368455) |

Defendant Jesse Garcia was charged by information with participating in a criminal street gang (Pen. Code, § 186.22, subd. (a), count 1)[1] and conspiracy to obstruct justice (§ 182, subd. (a)(5)). The charges arose out of an investigation into a 2006 homicide, which had lain dormant until Garcia and other members of the Los Latinos Locos (Triple L) street gang were implicated by someone in custody on an unrelated offense. Garcia was accused of entering into an agreement with fellow gang members to lie to police and obstruct the homicide investigation, preventing police from discovering who committed the crime.

Defense counsel filed a motion to dismiss the information pursuant to section 995. On March 1, 2016, the trial court granted the motion and dismissed the information.

On appeal, the People argue the trial court erred in granting the motion because there was probable cause to believe that Garcia entered into a conspiracy to obstruct justice. In the People's view, the court wrongly concluded that this charge required evidence that Garcia was an accessory after the fact (§ 32) or obstructed a peace officer in the performance of his duties (§ 148).

---

[1] Unspecified statutory references are to the Penal Code.

As discussed below, we agree the trial court erred and we will reverse the order.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Preliminary hearing testimony and evidence*

On January 14, 2006, Chau Nguyen was sitting in his car in the driveway of his residence when someone shot him twice in the head, killing him.  The contemporaneous police investigation did not uncover any viable leads and no arrests were made.

San Jose Police Detective Erin Fong was assigned the case in 2010, and in July of that year, she learned that an informant claimed to have material information about Nguyen's murder.  On July 27, 2010, Fong interviewed the informant, Alfonso Chavoya, who was in custody in an unrelated case.

In that interview, Chavoya told Fong that in late 2005 or early 2006, he went to see his girlfriend, Vicky Garcia,[2] at her house.  When he arrived, he did not see Vicky, so he wandered through the house looking for her.  As he entered the back bedroom, he saw two men, Augustin Rocha and Garcia, cleaning a gun.  Chavoya said that both Rocha and Garcia were members of Triple L and their gang monikers were "Sad Boy" and "Jeez," respectively.  According to Chavoya, the gun he saw them cleaning was a .22 revolver.  In addition to cleaning the exterior of the handgun, Chavoya saw Garcia wiping the bullets before loading them into the weapon.  When Rocha and Garcia noticed that Chavoya was watching them, they told him to get out of the bedroom.

Chavoya told Fong he left the room as directed, and left the house, too, because he could not find Vicky.  He returned about 9:30 that evening.  He and Vicky were in the living room when Rocha ran in, followed by Garcia.  Rocha was saying something like " 'What do I do?' " and Garcia yelled " 'Where is the gun?' " and " 'Get rid of it.' "  The two men went down the hallway to talk to Vicky's mother, who took a sweater Rocha was wearing and burned it in the backyard.  Chavoya left the house soon after.

_____

[2] Since Vicky shares the same last name as the defendant, we henceforth refer to her by her first name.

2

A few days later, Chavoya ran into Rocha again. Rocha told him that he had shot "an Asian guy" in the same neighborhood where Vicky lived.[3] Approximately one month after that encounter, Chavoya was talking with Rocha's sister, Felisa. Felisa, who had been dating Garcia, told Chavoya she saw Garcia dispose of a gun near McKee Road in San Jose. Felisa showed Chavoya the area where Garcia left the gun, but Chavoya could not find it.

Fong and another officer drove out to the site with Chavoya and asked him to point to the area where Felisa told him Garcia put the gun. At Fong's request, the records department searched for reports of discarded weapons, and it turned up a report of a .22-caliber revolver that had been found in the same area. That weapon was still in the police department's property unit.[4]

Based on the information provided by Chavoya, Fong obtained a court order to monitor and record Garcia's phone. Due to the length of time that had elapsed since the murder, Fong attempted to instigate conversation about the crime among the subjects by calling them in for interviews, interviewing their family members, and distributing flyers in the neighborhood promising a reward in exchange for information regarding the homicide. Fong spoke to Garcia's cousin, Louie, as well as Garcia's parole agent. On February 10, 2011, Fong asked Garcia's parole agent to tell Garcia that San Jose Police wanted to talk to him the following day about a homicide case.

The morning of February 11, police intercepted a phone call between Garcia and Cruz Castro.[5] Garcia told Cruz that his parole agent told him he had to talk to homicide

---

[3] Fong testified that Vicky's house was within walking distance of the house where Nguyen was murdered.

[4] According to Fong, she had the revolver sent to the crime lab for testing but, for reasons which are not disclosed in the record, the crime lab was unable to determine whether the revolver was used in Nguyen's murder.

[5] As discussed below, another person interviewed by police in this case shares Castro's surname, so we refer to both men by their first names.

3

investigators that afternoon.  He asked Cruz what his "boundaries are for that interview and if he should go."  Cruz told Garcia he had to go, but " '[a]ll you do is just, like, you don't know nothing.' "  Cruz also told Garcia that, after he met with police, Garcia needed to report " 'to [his] homies' . . . '[and] let them know what's happening with you.' "  Cruz advised Garcia that " 'if it starts getting sticky [during the interview], just clam up.' "  Garcia said he was " 'just going to straight up [say] I don't know nothing.' "

At the interview, Fong informed Garcia she was investigating a cold case homicide and his name, along with other names, had come up during that investigation.  She showed him photographs of the victim, the victim's house and the surrounding area, as well as photographs of Rocha and Felisa.  Garcia said he did not recognize the victim, though he recognized the area where the victim lived.  Garcia denied knowing anything about Nguyen's murder, and denied knowing either Rocha or Felisa, even when Fong identified them by name.  Fong said that Rocha also went by "Sad Boy" or "Adrian," but Garcia denied knowing anyone who went by those names.  Garcia was not "extremely cooperative" during the half-hour interview and provided no information to Fong about the murder.

Following the interview, police intercepted a phone call between Garcia and Frank Garcia, aka "Punch."  Garcia told Frank that he had just talked to the police about a homicide and that he had previously "cleared it with the big homie."  After asking Frank to "guess what it is," Garcia asked if Frank "remember[ed] what [Rocha] did?"  Frank asked why they wanted to talk to Garcia about that, since he "didn't do nothing."  Garcia said he did not know, but he was "stressing the fuck out."  He told Frank that when the police said they knew that he (Garcia) and Felisa used to date, Garcia replied, "I don't know what the fuck you're talking about."  Frank asked if someone was "telling on" Garcia, and Garcia said that someone "pointed the finger towards me."

Fong interviewed Felisa on February 15, 2011.  In that interview, Felisa said that she and Garcia "drank beer and had sex," but never had any conversations.

4

On February 23, 2011, Fong interviewed Garcia a second time. Garcia again denied knowing Rocha, Felisa, or Nguyen, and denied recognizing any of those people when showed their photographs. Fong asked if he had any affiliation with Triple L, but Garcia said he did not. Fong then told Garcia that in 2005 he and Rocha had been stopped by police together. Garcia replied that Rocha "looked familiar" and he " 'must have kicked it with him.' "

Fong also showed Garcia a photograph of his brother, Sammy Garcia, and Garcia identified him properly. He denied that Sammy was involved with Triple L, however. Fong displayed a photograph of Garcia's aunt, Suzanne, who Chavoya said had burned Rocha's sweater on the night of the murder. Garcia acknowledged the photo was of his aunt, though he refused to say her name.

In March 2012, Fong interviewed Jose Castro about the 2006 homicide. Jose admitted he had been an active member in Triple L in 2006. About three or four months after the killing, Jose was walking down the street when he saw Rocha, also a member of Triple L, driving by. Rocha pulled over to talk to him and admitted shooting Nguyen. Rocha told Jose he tried to carjack "an Asian dude," and shot him in the head. Afterward, he ran through the nearby creek to get to Garcia's house. Jose said that Garcia was in Triple L as well, and Jose believed that Garcia and Rocha were " 'tight.' "

After qualifying as a gang expert, Fong testified it was her opinion that Triple L was a criminal street gang, and that Garcia and Rocha were active participants in that gang. Fong also opined that, by withholding information about Rocha's involvement in the 2006 homicide from police, Garcia was acting to benefit Triple L.

B.      *Information and section 995 motion*

On January 29, 2015, Garcia was charged by information with one felony count of participating in a criminal street gang (§ 186.22, subd. (a), count 1) and one felony count of conspiracy to obstruct justice (§ 182, subd. (a)(5), count 2). In the course of the conspiracy, Garcia allegedly made false statements to police during his February 2011

5

interviews when he denied knowing anything about the 2006 homicide, denied knowing Felisa, and denied knowing Rocha. The information further alleged Garcia had three prison prior convictions under section 667.5, subdivision (b).

Garcia moved to dismiss the information pursuant to section 995. On March 1, 2016, the trial court granted the motion and dismissed the case.[6]

The People timely appealed.

## II.    DISCUSSION

### A.    *Applicable legal principles and standard of review*

Pursuant to section 995, a court properly sets aside all or part of an information upon finding that the defendant "had been committed without reasonable or probable cause." (§ 995, subd. (a)(2)(B).) " ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.) The showing required at this stage "is exceedingly low" (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846), and an information " 'should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged.' " (*Id.* at p. 842, quoting *People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226.)

In reviewing a section 995 motion "the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718; accord, *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).) Insofar as the motion "rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold

---

[6] Although the motion to dismiss was principally directed at count 2, the People conceded that count 1 could not stand on its own and must be dismissed if the trial court granted the motion as to count 2.

the defendant[] to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.' " (*Lexin*, *supra*, at p. 1072.) But "where the facts are undisputed, the determination of probable cause 'constitute[s] a legal conclusion which is subject to independent review on appeal.' " (*People v. Superior Court* (*Bell*) (2002) 99 Cal.App.4th 1334, 1339, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300.)

### B.    *Adequacy of the record*

Before turning to the substantive question presented, we address Garcia's claim that the appeal must be rejected due to the People's failure to provide an adequate record for review.  Garcia asserts that his section 995 motion was argued to the trial court on four separate dates in 2016, specifically February 4, February 5, February 18 and March 1, but the record on appeal contains only the reporter's transcript from the final, dispositive March 1 hearing.

It is well-settled that, on appeal, the burden is on the appellant to provide an adequate record, and "[i]n numerous situations, appellate courts have refused to reach the merits of an appellant's claims because no reporter's transcript of a pertinent proceeding or a suitable substitute was provided." (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186.)  That rationale for this general rule is grounded in "the cardinal rule of appellate review that a judgment or order of the trial court is presumed correct and prejudicial error must be affirmatively shown." (*Id.* at p. 187.)  When the record on appeal does not include the materials necessary to demonstrate prejudicial error, the appellate court cannot conduct the meaningful review necessary to decide the matter.

In this case, however, the record on appeal *is* adequate, despite the failure to include reporter's transcripts from the three February 2016 hearings.  That is because the standard of review in appeals from orders granting section 995 motions makes the trial court's ruling, let alone the arguments of counsel leading up to that ruling, almost entirely

7

irrelevant. (*Lexin*, *supra*, 47 Cal.4th at p. 1072.) We instead review the determination of the *magistrate* holding the defendant to answer based on the evidence adduced at the preliminary hearing. (*People v. Laiwa*, *supra*, 34 Cal.3d at p. 718.) Accordingly, we find the record on appeal adequate for our review.

   *C.*  *Conspiracy to obstruct justice*

  In this case, we must decide whether the evidence presented at the preliminary hearing was "such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.' " (*Lexin*, *supra*, 47 Cal.4th at p. 1072.) We think it was.

  Section 182, subdivision (a)(5), makes it a criminal act for two or more persons to conspire "to pervert or obstruct justice, and the due administration of the laws." "A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024.) As explained by the California Supreme Court in *Lorenson v. Superior Court* (1950) 35 Cal.2d 49, many of the offenses, such as "[b]ribery, . . . perjury, falsifying evidence, and other acts which would have been considered offenses against the administration of justice at common law are made criminal by legislative enactment." (*Id*. at p. 59.) Unlike those more specific statutes, section 182, subdivision (a)(5) "is a more general section making punishable a conspiracy to commit any offense against public justice." (*Lorenson*, *supra*, at p. 59.)

  In this case, the People presented evidence at the preliminary hearing which showed that, prior to being interviewed by police, Garcia spoke with Cruz, a fellow gang member who appeared to have some authority within the gang. In that conversation, Garcia agreed that, during the police interview, he would tell police he did not know anything about the murder. He further agreed that, after the interview, he would " 'report to [his] homies.' "

At his first interview with police, Garcia falsely stated he did not know Rocha or Felisa. After the interview, he spoke with another gang member, Frank, and, in that conversation, implied that the police interview was about "what [Rocha] did." Garcia told Frank that, when confronted by police with their knowledge that he and Felisa used to date, he again denied knowing what they were talking about.

In his second interview with police, Garcia continued to deny knowing Rocha or Felisa, again denied recognizing the victim, and denied any affiliation with Triple L. It was only when confronted with evidence that he and Rocha had been stopped by police together that he said Rocha "looked familiar." He persisted in downplaying their relationship though, saying they were casual acquaintances at most.

As outlined above, in reviewing this evidence, we "draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendant[] to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt.' " (*Lexin*, *supra*, 47 Cal.4th at p. 1072.) We think probable cause is clear and that a reasonable person would harbor a strong suspicion of Garcia's guilt. To recap: (1) Garcia entered into an agreement with Cruz; (2) with the specific intent to agree to obstruct the police investigation and protect his fellow gang member; (3) with the specific intent to obstruct the investigation; and (4) made false statements to the police in order to obstruct the investigation into Nguyen's murder. (See *People v. Vu*, *supra*, 143 Cal.App.4th at p. 1024 [elements of conspiracy].)

Garcia argues, citing *People v. Redd* (2014) 228 Cal.App.4th 449 (*Redd*), that the trial court properly dismissed the case against him because in order to bring an action for conspiracy to obstruct justice under section 182, subdivision (a)(5), there must be some reference to a defined criminal offense. Garcia reads this decision too broadly.

In *Redd*, the defendant, an inmate, was charged with conspiring to obstruct justice based on a scheme in which he arranged to have a prison cook smuggle tobacco into the

9

prison for him. (*Redd*, *supra*, 228 Cal.App.4th at p. 454.) On appeal, defendant argued that bringing tobacco into a prison "does not pervert or obstruct justice or the due administration of the laws." (*Id*. at p. 460.) The court agreed, noting that the sweeping language of section 182, subdivision (a)(5) must be " 'given content by the cases,' " so that the statute " ' "give[s] adequate guidance to those who would be law-abiding, . . . advise[s] defendants of the nature of the offense with which they are charged, or . . . guide[s] courts in trying those who are accused." ' " (*Redd*, *supra*, at p. 463, quoting *Davis v. Superior Court* (1959) 175 Cal.App.2d 8, 14.) Accordingly, it was incumbent on the prosecution to explain how conspiring to smuggle tobacco into a prison "constitute[s] a perversion or obstruction of justice or the due administration of the laws." (*Redd*, *supra*, at p. 463.) Because there was no separate statute prohibiting the act of bringing tobacco into a state prison nor was there any claim by the prosecution that doing so would be a crime under common law, the court found that there was "insufficient evidence" to support defendant's conviction under section 182, subdivision (a)(5). (*Redd*, *supra*, at p. 464.)

There is nothing in *Redd* which requires that a conspiracy to obstruct justice be founded upon a separate, specific criminal statute to survive a section 995 motion to dismiss. Rather, there must be some showing that the defendant's actions would obstruct justice. It goes without saying that affirmatively lying to police officers in the course of a criminal investigation for the purpose of shielding a fellow gang member from further scrutiny and, potentially, prosecution would fit that definition. Accordingly, it makes no difference whether Garcia's statements to police would be sufficient to establish violations of section 32 (accessory after the fact) or section 148 (obstructing law enforcement officer in performance of his or her duties), as the trial court seemed to suggest. Based on the foregoing, the trial court erred in granting Garcia's section 995 motion.

10

## III. DISPOSITION

The order dismissing the information is reversed.

                                                    _____
                                                    Premo, Acting P.J.




WE CONCUR:




_____
        Mihara, J.




_____
        Grover, J.




People v. Garcia
H043537

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. C1368455 |
| Trial Judge: | Hon. Helen E. Williams |
| Counsel for Plaintiff/Appellant:<br>The People | Xavier Becerra<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Seth K. Schalit<br>Supervising Deputy Attorney General<br><br>Bridget Billeter<br>Supervising Deputy Attorney General |
| Counsel for Defendant/Respondent:<br>Jesse Garcia | Under appointment by the Court of<br>Appeal<br>Dallas Sacher |

People v. Garcia
H043537